## Case No. 10,360.

In re NORWICH & N. Y. TRANSP. CO.

[8 Ben. 312.][1]

District Court, E. D. New York. Dec., 1875.[2]

LIMITATION OF LIABILITY — VALUE OF VESSEL — WHEN TO BE TAKEN — STIPULATION FOR VALUE — INSURANCE MONEYS.

1. A steamboat, by a collision with a schooner in Long Island Sound, was set on fire and sunk. Her owners filed a petition in limitation of their liability, and a reference was had to ascertain the value of the steamboat. Exceptions were taken to the report, which fixed such value at $2,500: *Held*, that the value to be taken was the value of the boat as she lay sunk; and that that value was correctly arrived at, by taking the

1 [Reported by Robert D. Benedict. Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

2 [Affirmed in Case No. 10,362.]

value of the wreck when raised and deducting therefrom the expense of raising.

2. Neither the expense of raising her, nor of the repairs subsequently put upon her, nor of the insurance moneys received by her owners, under policies of insurance against fire, was to be added to such value so ascertained.

[Cited in The Peshtigo, Case No. 11,018.]

3. The valuation of the boat, in a stipulation for value, given in the suits brought against her after she had been repaired, was immaterial.

The steamboat City of Norwich, while on a voyage from New London to New York in April, 1866, came in collision with a schooner, was seriously injured thereby, and set on fire, and presently sank. She was afterwards raised and repaired. The owners of the schooner brought suit to recover their damages in the district of Connecticut. The owners of the steamboat in their answer claimed the benefit of the limited liability act of 1851 (9 Stat. 635). The case went to the supreme court of the United States, and is reported in 13 Wall. [80 U. S.] 126. Freighters of cargo on board the steamboat also filed libels against her in this district, and the owners of her were allowed to substitute for her a stipulation for value (see Llewellyn v. Two Anchors & Chains [Case No. 8,428]), and interlocutory decrees in favor of the libellants were afterwards rendered (see The City of Norwich [Id. 2,760]). After the decision of the supreme court that the owners were entitled to the benefit of the act of 1851 [13 Wall. (80 U. S.) 104], the owners of the steamboat filed a petition in this court to obtain the benefit of the act, in accordance with the rules adopted by the supreme court in that behalf; whereupon an order was made by this court, staying all proceedings in the other suits, and referring it to the clerk, to ascertain and report the amount or value of the interest of the petitioners as owners of said vessel and her freight pending for the voyage upon which she was employed. See [Case No. 2,762]. The clerk reported that value at $2,500. Exceptions were taken to his report on behalf of the various libellants. [For a complete history of the case, see Id. 10,362.]

BENEDICT, District Judge. This was a proceeding taken on behalf of the owners of the steamboat City of Norwich, to obtain the benefit of the provisions of the act of March 3d, 1851, limiting the liability of shipowners. Upon presenting the petition, an order was made referring it to the clerk to ascertain the amount or value of the interest of the parties, as owners of said vessel and her freight pending for the voyage upon which she was employed. The report having been made, exceptions were taken thereto, which during the present month have been presented to the court for determination.

By some of these exceptions, the question is raised whether the value of the boat was to be ascertained as of a time after the collision and not before. In respect to this question it is sufficient to say, that it has been decided by the supreme court of the United States, in reference to this very collision, that the value of the boat after the collision was the limit of the owners' liability [Norwich Co. v. Wright] 13 Wall. [80 U. S.] 127. The exceptions to the report, on the ground that it was error to ascertain and report the value of the boat, as it was after the collision, must therefore be overruled.

No error appears in determining that value to be the sum of $2,500. The vessel was sunk and was of some value as she lay submerged. That value was properly ascertained, by taking what she was proved to be worth after she had been raised and deducting therefrom the expenses of raising her. The exceptions upon that subject must therefore be overruled.

Equally unfounded is the proposition that the expenses of raising the boat and the expenses of her subsequent repairs should be added to the aforesaid value. The exceptions which claim that such expenses should have been added to the amount reported, are therefore also overruled.

The fact that this boat had been libelled by various parties seeking to enforce, by proceedings in rem, their claims arising out of this collision, in which action, a stipulation for value in the sum of $70,000 was taken and the vessel released, has been also relied on here; and it is contended that the value of the vessel, as fixed by the stipulation taken in the suits in rem, must be taken as her value for the purpose of this proceeding, and furnish the limit of the owners' liability. The question here raised was passed on by this court when the order of reference was made. I can only repeat here, that the value, fixed in the stipulation for value taken in the suits in rem, was the value of the vessel at the time of her seizure in those actions. It did not pretend to be her value immediately after the collision; moreover, that stipulation was taken by virtue of the general powers of a court of admiralty, and not under the statute. See the stipulation, Place v. City of Norwich [Case No. 11,202]. The practice of taking such a stipulation, adopted in the case of this vessel, has so far proved convenient, and has since been resorted to in several cases, without objection made. I see no reason for rejecting the practice, arising out of the law since declared by the supreme court [Norwich Co. v. Wright] 13 Wall. [80 U. S.] 127. It proves a great convenience to parties to be able to give such a stipulation for value under the admiralty rules, and thus obtain immediate possession of the vessel, although it be intended afterwards to take proceedings to obtain the benefit of the statute. A stipulation so given holds good, until the actions in which it was given are made ineffectual by means of proceedings

taken under the statute, which proceedings, when concluded, afford foundation for the discharge of the stipulation for value. In no other respect do the two proceedings have any connection with each other; and the amount, for which the stipulation for value was given in the suits in rem, is wholly immaterial in a proceeding taken under the statute. In cases of maritime abandonment, under the general maritime law, neither the seizure nor a judicial sale of the ship, procured in opposition to the owner, but without contestation on his part, had any effect in determining the limit of the owner's liability, or prevented a resort to abandonment. Trib. of Commerce, Marseilles, 1828; Id. Aix, 1825; 2 Pouget, Droit Mar. p. 412. Nor would the case be changed if such a stipulation for value, as was taken for this vessel in the actions in rem, be deemed to be the substitute for the ship herself in court, and to which resort might be had in this proceeding; for it is plain that nothing in the stipulation itself estops the owners from showing what was the value of the ship at the time of the collision; and it is certain that the court would have power to require only so much of the amount of the stipulation to be brought into court as would be necessary to discharge the owners from their liabilities, and, upon the bringing in of such part, the court could direct the stipulation to be cancelled. The exceptions raising this question are, therefore, overruled.

No freight was earned. The freight then pending was entirely lost. The exceptions on this subject are, therefore, overruled.

The remaining and main question to be considered is, whether the amount of money, paid the owners by insurance companies in performance of their policies of insurance upon the boat, is to be taken as forming part of the value within the meaning of the statute. The facts bearing upon this question are, that the boat was so injured by the collision that water rushed into her hull, whereby the flames were driven out from her fires, and she at once commenced to burn, and was to a great extent consumed before she sunk.

There was an insurance upon her against fire, on which the owners have secured the sum of $49,283.07, and this money, it is insisted, must be accounted for by the owners before they can be held to have complied with the statute. The insurance was reported by the commissioner, and he declined to include that sum in his report. I am of the opinion that his conclusion is right.

It might be said that this question had been removed from the case by the form of the order of reference, which was settled with care upon notice, and which confines the inquiry to the value of the vessel. But I do not rest my decision upon that point, nor do I consider the question to have been disposed of by the decision of the supreme court of the United States, where the value of the vessel alone is spoken of as the limit of the owners' liability. The words "value of the vessel" have, doubtless, been thus used without any reference to the question of insurance money; and the most that can be said is, that the use of those words by the supreme court, and in the order of reference, shows that the question under consideration here did not present itself as a question to be raised. Indeed, the language of the statute seems to render it impossible to raise such a question. Plainly, the words of the act do not cover the insurance money, and the absence of any allusion to insurance is significant. It is difficult to believe that such money would not have been distinctly mentioned, if there had been any intention to include it. It is, nevertheless, argued that the right of action of those freighters attached at the instant of the collision, by reason of the negligence whereby a collision resulted and put it out of the power of the boat to carry and deliver the goods; that the value of the boat, at the time of the attaching of the liability—that is, at the blow, and before the fire—is, therefore, the limit of the owners' liability; that any assignment made in pursuance of the statute would relate back to this time, and cast upon the freighters the risk of all subsequent perils; and that to the freighters must also be transferred all claims and rights of action arising from, or out of, the vessel by reason of any occurrence subsequent to the attaching of the liability; that the owners, at the instant of the collision, became trustees of the vessel for those who suffered damage by reason of the negligence, and any compensation or indemnity received by the owners is received for the benefit of the sufferers, and must, therefore, be accounted for in a proceeding like this.

But with this argument there are two difficulties. In the first place, the fire was part of the original disaster, and not a subsequent occurrence. It was, in this instance, a necessary result of the blow. It is impossible, therefore, to separate the fire from the collision so as to say that the risk of fire was upon the freighters. All that was left in existence by the blow of a colliding schooner was a vessel at once to be burned up and sunk from the necessities of the case. The value of such a vessel consists in the value remaining after the fire and sinking, and that value the sufferers have, by the report under consideration.

In the second place the amount received for the insurance did not arise from or out of the vessel, but out of certain contracts of indemnity made by the owners of the vessel, to which contracts the freighters were not parties. Those contracts were not, and, without the consent of the insurers, could not be, transferred to the freighters, nor does the statute make any provision for such a transfer. The assignment provided for by the statute, if possible to be made after the collision and before the fire, would pass no right

of action upon the policies of insurance, but would simply determine the interest of the insured in the property and discharge the insurer from the risk. Moreover the law does not compel the ship-owner to take the benefit of the statute. He may elect whether or no to take proceedings to limit his liability; and until such election is made what interest can the freighters have in the vessel?

This question, although new in this country, because the statute is recent and has been seldom resorted to, is in truth an old question, long considered as settled in other lands. It cannot be doubted that our statute limiting the liability of ship-owners was intended, so far as it goes, to confer upon the American ships the benefit of the law of abandonment long recognized as part of the general maritime law, among the maritime nations of the continent, and so the supreme court declared. [Norwich Co. v. Wright] 13 Wall. [80 U. S.] 121, 127. In respect to the question under consideration, I see no difference in principle between a proceeding under our statute and one under the general maritime law. Certainly the words of the statute make no difference in favor of the freighters. The exercising of the right of abandonment under the maritime law has often brought up for consideration the question, whether the owner must surrender insurance money in order to limit his liability by an abandonment; and it appears to be the settled law that in such case a surrender of the insurance is not required.

Says Caumont (Dict. Droit Mar. tit. "Abandon Maritime," § 54): "So, if the ship-owner has judged it prudent to effect insurance by means of a premium more or less in amount, which he has paid, it is evident that the charterer and the shippers cannot take from him the fruit of a wise forethought and receive the advantage of a contract to which they are strangers." The possibility of fraud which, upon this argument, has been urged as a reason for requiring a surrender of the insurance, is considered and rejected by the same authority (Dict. Droit Mar., tit. "Abandon Maritime," § 55). So also it has been adjudged (Aix, 8th Feb. 1832) "that the ship-owner, who, in order to free himself from loans contracted by the master during the voyage, abandoned the ship and freight, is not bound also to abandon the product of insurance effected upon the ship." The same was adjudged at Rennes, Aug. 12, 1822. See, also, 1 Boulay Paty, p. 297. The Code de Commerce is in substance a declaration of the general maritime law, and section 216 of the Code has been adjudged to be identical with the rule of the maritime law as declared by the ordinance. The construction given to the Code affords then a plain indication of the intent of our statute, which, as the supreme court has justly remarked, was passed in the light of the law existing in other countries, including the amendments of the law of France in 1841. And it was never supposed that either the ordinance or the Code de Commerce compelled a ship-owner to surrender his insurance money in order to effect a maritime abandonment. In 1841 the effort was made in France to amend the Code de Commerce so as to require a surrender of the insurance as well as of the ship's freight. The considerations affecting both sides of the question were then pointed out and discussed, and the amendment was rejected, with the declaration that by the existing provision of the Code the ship-owner is not bound to account for the ship's insurance in order to effect the maritime abandonment. 2 Pouget, Droit Mar., pp. 415, 419.

It must be said that some of the considerations, then urged in favor of the rule as declared, have a greater force in France than here, because of the provisions of the Code, which forbid insurance upon freight, and thus, by rendering it impossible for the ship-owner to protect himself against all risk of loss, in a measure protect the freighter against collusion. Still, the weight of the argument appears to be greatly upon the side of the rule as declared, and such, without doubt, was the law, in the light of which our statute of 1851 was enacted; and the rule of the maritime law must be considered as having been intended to be adopted by that statute. The exceptions upon this question must, therefore, be overruled.

I have now considered all the questions raised by the exceptions which seem to be of sufficient importance to be noticed. I do not consider the point now first made in this court, that the statute of 1851 cannot be taken advantage of by a corporation, for the reason that the supreme court of the United States has, in respect to these same petitioners, plainly declared them to be entitled to the benefit of the act. It is true that no allusion is made, in the opinion of the court, to the fact that a boat was owned by a corporation; but that fact was proved, and the question can hardly be supposed to have been overlooked.

Let an order be drawn in accordance with this opinion.

[On appeal to the circuit court, the decree rendered in this court was affirmed. Case No. 10,362.]